Okay, we have lots of lawyers in this one. Mr. Heroy, you're going first. Good morning. My name is Rob Heroy. I, along with my colleague Mark Urechek, represent Izzat Freitekh. Mr. Kilborne here represents Tarek Freitekh, who is his son. I plan on addressing issues that are related to the sentencing guidelines, primarily focusing on intended loss. And those issues, to a certain extent, overlap with Izzat and Tarek. I believe this case presents an excellent vehicle for addressing intended loss and Kaiser issues. We've already addressed that. At least the Kaiser issues have been addressed. I believe so as well, Your Honor. And I think with intended loss, this case is a great vehicle. I think Izzat Freitekh is someone who was living the American dream. He owned a successful restaurant. He had a beautiful family. And he is someone who is now in federal prison with a sentence that's been grossly enhanced based on intended loss, which is based on a charge. So how does Kaiser and the analysis relative to Kaiser that we laid down in the Campbell opinion assist you in your argument? I think it is dead on because I believe the term loss is unambiguous. I think there's a lot of different ways that we can define loss. We can talk about economic loss. We can talk about direct or indirect loss. We can talk about emotional loss. But under no concept or no definition of loss is it measured by the intent that someone intended to inflict as opposed to the harm that is inflicted on the person who suffers the loss. Why is this an intended loss issue? I kind of understand the intended actual distinction if he sought to get, if the allegations were he sought to get these PPP loans fraudulently but didn't get them. These particular defendants sought and obtained the benefit of PPP loans that were deemed to be based on fraudulent activity. I know you can test all that. But the money from the banks got into their hands and they used it. Now, sure, some of it got back. But I wonder if that is an actual versus intended issue or it's what the guidelines refer to as a credit sort of issue, which the guidelines say that can be taken into account as a credit if the money is returned before the fraud is detected, which as I understand it didn't happen here. So I wonder if we're kind of getting off on something we don't need to. I appreciate that issue of actual versus intended. I may agree with your definition of loss. But I wonder whether that's even applicable here. Well, and I see exactly where you're coming from, Your Honor. But I think in this case we have a district court that based it on exactly that. Izzat was acquitted of the fraud offenses. He was convicted only on money laundering. We argued to the district court the intended loss issue as well as the fact that Izzat did not intend to launder $1.7 million. The district court, when it fashioned its decision, went back and said we're actually going to go back and treat this as if he had been convicted of the underlying fraud offense. And, therefore, we're going to go back and use intended loss principles to support that. In addition, when we said he didn't intend to launder the full amount, that only $300,000 was spent, the district court also went back and said we're looking at the conduct, the fraud as a whole, and the amount that was intended to be taken through the PPP loads. And I understand that. The district court's reference makes it a relevant and fair argument. I'm not suggesting otherwise. But I wonder if a way of addressing any issue there might be that this was never, in terms of the overall scheme or plan as alleged, that there was actual receipt of that money. And I think that's where, I certainly understand where you're coming from, Your Honor. And I think that's sort of where this case, with the fact that these were loans, got complicated. Because at the end of the day, he was only convicted of money laundering and only approximately $300,000 or so were spent. And so the court, the district court, had to go back and say, well, I think we have to assume that the intent of the fraud was to take $1.7 million. And eventually to launder that $1.7 million. And we did have a sufficiency argument that the court passed on. We believe it's important. But I kind of thought that... Well, what's your best authority to support your argument that the intended loss can't be used for the whole amount? I guess I'm trying to understand. I apologize. Is the court asking for... What's your best authority to support your argument as you frame the argument? I think the way the district court calculated the sentence takes us exactly there, Your Honor. I mean, case law. What is your best case law to support your argument? Your Honor, I would say we could look back to Campbell as an example of that. Okay. And I would say that that's why we get there here. And I recognize we had another opinion shortly thereafter. Well, that's after. Yes, Your Honor. So I think with intended loss, there's a couple problems that the government just can't avoid. And I think one of those is the fact that we've got to go from a specific definition in 2B1.1 back to 1B1.3, to a much more general definition regarding intended loss. I also think there's some other issues here where in the government's brief, in this case, the government argues the term loss is unambiguous and it goes in our favor. But in the very next case, the government argues, well, the term loss is ambiguous, and so that's why we need to resort to deference to the sentencing commission. And then I think finally we have an issue with here where the government concedes that our or Stinson or Seminole Rock deference applies, but then they continue to cite Stinson as if it's controlling authority. Okay. And your time is up. I hope you have some time in rebuttal. Thank you, Your Honor. So we'll hear next, I think, from Mr. Urechek. Good morning, yes. May it please the Court, my name is Mark Urechek. I'm going to be addressing, for lack of a better term, the attorney issues in the case. There's two because there were two attorneys subpoenaed to testify. Right. So you're covering the attorney issue for both Izzat and Turek? Yes, Judge, both of them. Okay. I'd like to start, if you don't mind, by addressing Izzat's attorney, our client's attorney, Mr. Odom, who was subpoenaed to testify as a witness. Now, I understand that the government has presented in their briefing that they were compelled, that they had to call this attorney as a witness, and we are sympathetic to the government's hesitation to call attorneys, but we think the government had at least two off ramps in this situation where they definitely did not have to call Mr. Odom, and that, hence, a violation of 403. Let me address the first issue that I believe creates an off ramp. The government argues that Mr. Odom was a necessary witness to establish a violation in Indictment Count 8. Okay, go ahead. To get the documents in, right? I'm sorry? To get the documents in as well, right? Well, they want to get the documents in, but they're saying that he was a necessary witness to establish. . . How would they get the documents in that they needed to get in without either a stipulation or the testimony of counsel? Well, Judge, I think, respectfully, I think that's the wrong question. The question is whether. . . But it's my question. I understand. So how would they get those documents, and then you can go back to what you wanted to argue. How would they get the documents in without either a stipulation or the testimony of counsel? Well, I don't think they would, but I don't think it would have been important. It would have been cumulative, Judge. It would have been cumulative, and so now you're going to go back to your argument about how they could have proved Count 8 otherwise. Count 8 was a false statements indictment which specified statements made during a proffer where there were not one but two government agents in the room who testified as witnesses, not to mention that Esau himself testified to the statements that were alleged to have been false. So that's three witnesses. So the testimony. . . Odom wasn't necessary to establish statements. That's, in fact, conceded. . . Odom wasn't necessary to establish what? The statements, the false statements. It's conceded at page 21 of the government's brief. The only thing Odom was necessary to bring in was documents, and not even all the documents, just documents that were sent after. . . Weren't the documents necessary to establish the false statements? No. Because weren't the false statements about the documents? The false statements were about fiber capital. The documents simply bolstered the false statements. It was cumulative, Judge. Did you object to cumulativeness at trial? There was a 403 argument, Judge, and that's . . . I'm trying to siphon this back to a 403 argument. Okay. This ends up being a 403 situation, Judge, for exactly that reason. All it was was cumulative. And so now all you have is unfairly prejudicial evidence to wit the attorney for my client testifying against him, albeit under subpoena that the court disclosed that he was under subpoena. But it's his former attorney testifying. . . And the testimony was limited by the court as well, correct? The testimony was limited both ways. And there was a . . . right, both ways. There was a preview even of the cross-examination out of the presence of the jury to make sure it would not be unfairly prejudicial. But also ended up in the exclusion of at least one examination question that we think should not have been excluded based on privilege about a third party's communication to . . . Well, excuse me. I'm sort of sliding over to the other attorney, but I'll morph over to that a little bit, and I'll try to return to 403. Tariq's attorney, Chris Fialco, was subpoenaed as well. He was brought in. There were objections. There was a preview cross-examination, like you said. Fialco disclosed at that point that the screenshots that were the subject of a believed count not . . . or, sorry, count not in the indictment were not provided to him by his client, Tariq Freitag. But wasn't he allowed to cross-examine him regarding that? Regarding his screenshots? Not completely. The cross-examination was limited. There were questions that we were not allowed to ask. But wasn't he allowed to cross-examine him that he didn't . . . he played no part with the screenshots? Wasn't that . . . he was allowed to cross-examine him as to that issue, right? I would . . . Judge, I don't want to nitpick your words, but played no part is not the terminology that was used. And that was important for us to show that there wasn't some mastermind situation going on with Esau. And the entire defense in this case was trying to separate Esau's culpability from the pretty clear culpability that Tariq had in forging these documents, while the government was trying to hold them together. So, any opportunity that we had vis-à-vis Fialco to distinguish Tariq's role from Esau's was important. Now, what you had with these screenshots was not just the screenshots, but a communication with another party who spoke English, which our client did not. And who communicated something, we still don't know what, but something to Mr. Fialco that we were not allowed to explore in cross-examination of Fialco. So, our purpose was to distinguish Esau's role from Tariq's. Here we have a third-party co-conspirator, I think it's fair to call him a co-conspirator because these were the concocted screenshots that were clearly forged, sending these messages to the attorney. So, it's not a privileged communication, but Mr. Fialco invoked attorney-client privilege in the practice cross-examination. There was a subsequent sealed hearing where they got the information on the record so you have it, and the court upheld the claim of privilege. I still struggle, and I mean I've wrestled with this a lot, to figure out how a communication from a third party to the attorney, who is not the client, can be an attorney-client privilege situation. So, I think the court erred there, and the result of the error was that we didn't get to explore what was in that email from Rashawn Verne to Mr. Fialco. Now, unlike Mr. Himerly, I don't want to chew into my co-counsel's time. All right, and you have some time in rebuttal as well, so Mr. Kilbourn. Judges, may it please the court, James Kilbourn, I'm here for Tariq Freitag. I want to make sure that you know correctly each of our roles. I am the only one up here representing Tariq. I've been appointed under the CJA. I'm very proud to represent Tariq. I certainly share the concerns about loss, but what I'm most concerned about, Your Honor, today is that Tariq lost his attorney. He had his attorney taken from him because the government chose to bring an 18 U.S.C. 1001 regarding activity that occurred during the discovery process of the trial phase. And I argue that that is a violation of his fundamental rights, impairing his ability to have counsel of his choice, which is a Sixth Amendment right. Obviously, Tariq protested when his attorney was removed. But there was an avenue to avoid that. Tariq could have stipulated, correct, to the documents coming in. He could have, Your Honor, but I would argue that's a Faustian bargain because he has a right to make sure all of the elements are proven. And if you look at the stipulation versus the testimony that was actually given, the testimony of his lawyer was that these documents came from a third party. Obviously, the jury didn't believe that, but that was the testimony that the lawyer gave and what he swore under oath. So what you're asking Tariq to do is to stipulate to a fact that will not be introduced by his attorney at trial. And we think that creates a situation where you have to give up your fundamental right to contest the elements of a crime in order to keep your attorney. We believe that there are much better avenues for handling a fraudulent activity that occurs during the course of a trial. And obviously, this court has determined that. So what would the alternative be? Perjury, for example. How does Mr. Tariq Freitag get these documents into his defense? Either he has to testify or the third party has to testify to be able to bring those documents. The government has all the information they need to contest. But the false statements were provided before trial in the proffer. They were provided before trial as part of the trial's discovery process. We think that's an important distinction. You know, Mr. Odom's issues happened during an investigative process before the indictment and before Mr. Odom had made an appearance as counsel. We believe that stepping 1001 into the trial process creates this potential issue and the issue in this case that actually occurred of losing his right to counsel of his choice and expanding that in a way that 1001. So perhaps the false statement count should have been severed from the rest of the indictment and tried separately? That is one argument we've made. If you're going to do 1001 for activity that occurred during the trial preparation, we argue that it should be severed. That what you've done is you've basically criminalized activity between attorneys. And I want you to think for a second about who actually provided this document. His attorney did. Now either his attorney provided this document because his client said so or he provided this document because he thought it was important or something he would use at trial. But in reality, whoever it was that created this false document, the document was provided to the government not in investigation, not in its administrative function the way 1001 is normally prosecuted. But in this case, it was actually provided during the trial buildup phase. So you have perjury. You have the ethical requirements of attorneys that protects you during the trial process. You have the right of cross-examination to protect the government from false documents during the trial process. And I think the fundamental problem with this is if you let 18 U.S.C. 1001 into the trial preparation process, you endanger attorney-client privilege. You endanger the right to counsel. And you endanger the process. Because this is... But the challenge for the government is arguably it was appellant who put the false statement statute into the trial process. Arguably. And that's, I assume, what the jury found in order to convict him of this. Right. It's not even arguable anymore. He's convicted. He's convicted of that. But it did not happen as it did for his father during an investigation. It happened during the trial buildup. And there are so many tools that are historically available to the court, to the government, in prosecutions that work so much better than a prosecution under 1001. And bringing the trial now and putting on trial the trial preparation for what the original trial would have been. And if you think about it, think about how does this document even come in if it's going to be used by the defense? Someone has to testify to its veracity. So you have perjury. The government, like I said, can cross-examine that witness as to how this was created. And the jury themselves, who are the ultimate arbiters of truth, would decide... So the government would have had to, based on your argument, the government would have had to have waited until the defendant himself put the documents in the trial? Or they never come into the trial at all. Wow. Now, the government says this is material. And again, remember, 1001 requires materiality. So the government's just supposed to ignore false documents? Your Honor, they won't ignore it. I can guarantee that. There will be a time to address it. Okay. The time to address it is when it is introduced into the trial process. Probably one of the first defenses in the proto-courts of old would have been someone else did it. And the courts are so equipped to handle evidence, argument, that someone else is responsible for a crime and not the defendant, that bringing 1001 into that process taints the entire procedure, we would argue, Your Honor. How do you suggest that the government would have been able to lay the foundation at trial? I don't think the document would have gotten in unless the defendant or the third party testified to that particular document. Just like any other argument. So to answer Judge Benjamin's question, the government would not have been able to lay the foundation for their case-in-chief. They would have had to wait until the defense or somebody put it in. Well, we're talking about the case-in-chief for 1001. Right. Which we're arguing that the courts had a chance. That 1001 has no place in the trial process. That it is an investigative statute. It definitely is. This court has found... Well, now, once you're charged with 1001, you have to have a trial. You do. You do. But I'm saying 1001 has no place in the trial process. And this court's found that before. I don't know what that means. That 1001 is a statute dealing with investigative and administrative... I know what the statute is. Yes, ma'am. It deals with investigative and administrative offenses. It is already excluded from ordinary trial tactics. This court has found that ordinary trial tactics are not encompassed... In what case law is that that you're saying we found that? Yes, ma'am. Sorry. No problem. Well, I don't want to take up too much of your time. You can tell me on your... It is in the brief that it is excluded from the trial process. And that's understandable. If someone lies to a judge, it's not 1001 is perjury. If that's under oath. That is, 1001 is an administrative statute. Okay. I think I understand what you're saying now. And I apologize for taking so much time getting to this position, Your Honor. But we believe that his loss of his counsel of choice taints the entire proceeding... Preventing him from having the defense that he wanted to have. And that he had chosen and prepared for and paid Mr. Fialco for at the original trial. So we would argue that that taints the entire process from the moment that his attorney becomes a witness. Not to mention the fact that either that document was provided by a third party and there is no privilege... Or it was provided by Mr. Tariq as the government suggested. And the communications, as the court found, between my client and his attorney are privileged. So if you put 1001 into this discovery process, these problems just start spitting out indiscriminately, Your Honor. And so we're arguing that that's where the problem in this case started. Thank you. All right. Thank you for your argument. We'll give Mr. Barber a turn. May it please the court, Kevin Barber for the United States. So as the discussion this morning has shown, this case presents a number of issues. And I'm happy to discuss them in any order that the court prefers. Perhaps I could start back with the loss... You should start with whatever, however you want to frame your argument. But maybe speak a little closer to the microphone. Sure. Sorry about that, Judge Thacker. So if the court's okay with it, I'll start with the loss issue. I think that's an important question. In our view, the intended loss commentary to the guidelines, which has been part of the bedrock of federal sentencing for over 30 years, is valid and binding under the Kaiser v. Wilkie framework. At step one of that framework, you ask whether the regulation or here the guideline itself is genuinely ambiguous. We do concede that the word loss in isolation in the relevant guideline, 2B1.1, is ambiguous in the sense that loss can mean many different things. The guideline itself... How can... I think loss can mean a bunch of different things, but how can it be intended loss? I think because, Judge Quattlebaum, the word loss on its own just means a reduction or a diminution of some kind. And that doesn't tell you anything about whether you're talking about a loss that has actually occurred or a loss that is intended. I'm not following that. A diminution, I agree, a decrease or a diminution is kind of consistent, those definitions. But how does that... That indicates something has been diminished, not that it was intended to be diminished. I'm trying to figure out how the word loss can create some ambiguity as to whether intent is involved. Sure. So one thing I'll say just at the outset, the only circuit that has ruled against this on this point, the Third Circuit, itself acknowledged that loss is ambiguous in this way. It can mean actual loss or intended loss. It may be helpful if I gave you a real-world example of this. So if I said, like I'm a Red Sox fan, if I said, I hope the Yankees lose tonight, and then I say, the loss will drop them into third place in the division. In that second sentence, the word loss is clearly referring not to a loss that has actually occurred, but to a loss that I hope will occur. So the point is that you look to the context to figure out whether I'm talking about intended loss or actual loss. And sometimes the context makes clear that you are just talking about actual loss. So if you look at the guideline for insider trading, I think it's 2B1.4, that guideline says something like, if the offense caused a loss exceeding $6,500, you enhance the sentence accordingly. That signals to us that you're talking about a loss that was an actual loss that was caused by the offense in the past. This guideline just says, if the loss exceeded $6,500, enhance accordingly. So it's a little bit more bare bones. It doesn't tell you as much. Hypothetically, if we think loss is not ambiguous and it does not include intended loss, do you have an alternative argument that the entire amount here was actually received by these defendants, even though some of it may have been paid back, that the entire amount was received? I can't recall if you briefed that or you just were all in on the intended loss issue. But do you have an alternative argument? So we didn't brief it that way because the district court didn't handle it that way. Obviously, this court can affirm on any ground in the record. So if you make the determination that there was an actual loss here of $1.75 million, I think, on this record, then I think you can affirm on that basis. The thing I want to point out, though, about the meaning of loss, even if this court says the word loss in isolation unambiguously means actual loss, I still think that the other tools of construction that the court has to apply at step one or step two of the Kaiser analysis would inject ambiguity into the meaning of that term. So if you look to the history, that would certainly add ambiguity because the guidelines have always been understood by the Sentencing Commission to include intended loss if it's greater than actual loss. The structure, you would look to that relevant conduct guideline that says that when you apply the specific offense characteristics, which 2B1.1 is one of those characteristics, you take into account harms that were the object of the offense. That points towards intended loss being included. And then, of course, you have the purpose of the guidelines in this guideline in particular. And the government's reading and the commentary is much more faithful to the purpose here, which is measuring culpability. And intent is much more important to culpability than the happenstance that results in terms of loss from the offense. So even if you thought the word loss on its own was unambiguous, those other tools of construction would inject ambiguity into the analysis. And then for the reasons we discussed in our brief, we would prevail at Kaiser's step two because this commentary is exactly the kind of agency interpretation of a regulation that Kaiser instructs should get deference. So I just wanted to make that clear. And the other thing I should add on the loss amount is that, in our view, only Izzat has preserved that claim in this court. If you look at Tariq's opening brief, I don't think he actually raises the claim. He just raises a claim about devaluing of the actual loss. And in Izzat's case, I think we do have a strong harmlessness argument. So that's another way for the court to potentially handle this issue or not decide it. I do think that the presence of the issue in the Bullard case... Which one did you say you have a strong harmlessness argument? Izzat. And that's because, contrary to what my friends were saying, the guidelines didn't drive Izzat's sentence at all. He had a substantial downward variance. I think his sentence was about 55% of the low end of the guidelines range. And so in that circumstance, you can say that any guidelines error was harmless. I do think that the fact that you may have to decide the issue in the case to follow this one may counsel against using that kind of off-ramp. You may just want to meet this issue head-on, even though the Sentencing Commission is resolving it itself in the guidelines this year. If there are no further questions on the loss amount, I can talk about the other issues. Maybe go to the attorney issue first. Could you explain how using the attorneys as witnesses didn't unfairly prejudice the appellants in as much as it sort of tainted the whole trial process and they didn't have the counsel of their choice? Yes, so the counsel of choice claim is just coming from Tariq because Izzat's counsel, who had to testify, had already left the case by the time trial came around. And here we think that the district court clearly exercised its discretion in a prudent, unfair way in permitting Attorney Fialco to withdraw. I think there has been a concession by my friends that the government had no other option for getting this evidence into the trial except for... Okay, a concession that the government had no other option. Mr. Kilbourne did offer some options that the defense would have put it in and then you could charge him with perjury or something, I think it was. And also the other option could have been to sever that count from all the money laundering counts of the indictment. Yes, so I'll take those in turn. First of all, I strongly disagree with the idea that we simply have to let it slide, let a false statement slide, unless the defendant decides to actually use the concocted evidence in his defense. When a defendant manufactures evidence, makes false statements to the government before trial, those are violations of 1001. They pervert the course of justice, they consume public resources in ways that justify a prosecution under Section 1001, regardless of whether the defendant intends to bring that evidence in at trial. So that was an unacceptable suggestion to us. As for severance, there was no motion for severance in this case, and there's certainly no claim on appeal that there was an abuse of discretion in not severing the trial. But the government could have done that as one of the alternatives. I know there's either stipulation which they wouldn't agree to, or the lawyer is now a witness, but the government could have itself severed, couldn't it? We could have. I don't think that would have been justified, because the rules favor joinder of related offenses. This offense was very closely intertwined with the other offenses. So I think that would have been unjustified, and I think that severance would have been justifiably denied by the district court, even if we had suggested it. It would have been a huge waste of judicial and public resources. Even if the case had been severed, Tariq still would have had to get a new attorney for that other trial, and there could possibly have been a conflict in any event, because that would have meant that Attorney Fialco would be representing Tariq at his first trial, while he's a prospective witness against his own client at another trial. So I wouldn't assume that that would be okay, either. I think what this boils down to from Tariq is a notion that he had an absolute right to the counsel of his choice, such that we couldn't put him to this decision between stipulating and losing Attorney Fialco as his lawyer, and that's simply incorrect. The Supreme Court has made clear that counsel of choice is not an absolute right, and that district courts have substantial latitude to disqualify counsel or here to accept the withdrawal of counsel when there is an actual or potential conflict. So the district court here acted well within that substantial discretion. Well, and then a person in counsel also argued that having the attorneys testify was also unfairly prejudicial. What's your response to that? So I think that the district court did a good job of mitigating any potential prejudice here, Judge Thacker, in the way that I think you mentioned, by confining the government to a limited list of five questions to direct to the former counsel. Limiting the scope of direct examination that way, I think, was a good way to prevent any unfair prejudice. The district court also told the jury these attorneys are appearing pursuant to subpoena, so it didn't suggest that they were sort of pinch-hitting for the government against their own clients in some sort of unseemly way. So I think the district court did a good job here with the best of a— And then there was at least one question that opposing counsel said they wanted to ask on cross, but they were not permitted to, that it was some third-party assertion of attorney-client privilege that is not applicable, at least as their argument goes. Yes, I think this gets to the question that was objected to on attorney-client grounds regarding the content of the email from the so-called person, to Attorney Fialco. We've, as we've explained in our brief, no further cross-examination of Attorney Fialco by Izzat was necessary, because, again, this is in tension with what my friend was saying, there was no suggestion by the government at any point in the trial that Izzat was at all involved in the screenshots matter, and the screenshots were the subject of Attorney Fialco's testimony at the trial. There was no need to further explore that subject. There was no claim that Izzat was involved. And Izzat did get the opportunity to ask Attorney Fialco, you know, was Izzat involved in that matter in any way? And Fialco said no. So I think Izzat is kind of in search of a trial error there that didn't happen. There was no need for that at all. And then I think the remaining attorney issue is the 403 question. On that, I just wanted to strongly dispute the idea that the documents that Attorney Odom's testimony was necessary to bring in were somehow cumulative or unnecessary. That evidence was really important to us in prosecuting the false statements offense, because it was some of the most evocative and strong evidence in support of the idea that Izzat knew that the Kyber Capital story was bogus. So the Kyber Capital envelopes that were turned over through Attorney Odom were sent to Izzat in, I think, May of 2020. They contained, according to Izzat, documents that he had actually signed, according to him, on April 1st of 2020. So it was a clear signal that the whole story was nonsense. And there was no other way to get that evidence in, so it clearly was not cumulative. And it was some of the strongest evidence in support of that claim. So I don't think the government could have been compelled to sacrifice that part of its case simply to avoid any need for Odom's testimony, particularly since the district court made those strong efforts to limit any potential unfair prejudice from the attorney's testimony. So I'll leave that issue at that. And we haven't discussed the sufficiency challenges at all. But if the court has any questions on that, I'm happy to take them. I think that the sufficiency challenges here clearly fail under the demanding standards that apply to those claims. What's your best evidence that Izzat was not aware of the fraud? So our claim would be that Izzat was aware of the fraud. I think the best evidence of that is his forwarding emails from Bank of America while the applications were being submitted regarding the status of the loan applications. He forwards those emails to Tariq, and then Tariq quickly starts uploading additional documents in support of the fraudulent applications. We have the basic fact that the money here was going into Izzat's accounts and then was distributed by Izzat to his family members. We have the fact that Izzat himself testified. Or payroll for companies that they weren't working for and that some of them weren't even open. Yes, exactly. The notations on the checks, payroll or paycheck, were clearly false. They were designed to make the checks look like legitimate PPP expenditures even though they were not. Izzat acknowledged writing the checks even though he made a self-serving denial that he wrote that particular part of the check. The jury was not required to credit such a denial. And there was other evidence as well. Izzat himself testified that he knew on, I think it was May 14th, when the million dollar loan came in for the Green Apple Company, that something was amiss. Because Green Apple had no employees, no operations. Izzat himself had just created it in March of 2020. And then in the days and weeks that followed, he proceeded to write all of those checks that he testified he wrote. So I think he kind of convicted himself there of the money laundering offenses. He, in his reply brief in particular, tries to kick up dust about whether the acquittals on the fraud counts have some relevance to the sufficiency analysis for the money laundering convictions and the other convictions. That is clearly wrong under the Powell case from 1984. If you look at the Supreme Court's decision at page 67, it says that the sufficiency analysis is independent of any counts of acquittal. The court has no further questions. I can leave it there and just ask the court to affirm. All right. Thank you for your argument. We'll hear again from Mr. Hayroy. You have two minutes in rebuttal. Judge Quattlebaum, I take your question very seriously here. Reviewing the transcript, I think it is a very complicated question. But the district court made a very specific factual finding that sitting on loan money that is received is not actual loss, but that is intended loss because we assumed that the money was meant to be spent. I would say at minimum that the court needs to confront the intended loss issue and that if the court found in our favor an intended loss, that this would need remand back to the district court judge for a factual finding by preponderance of the evidence as to whether or not a loss had occurred there. As far as harmless error goes, I certainly think this is a case that is not harmless error. If the objection was sustained, we would go from a variance that was 54% of the low end to a variance down to 84% of the low end. And it requires a tremendous amount of guesswork to assume that the judge in no way tethered the sentence to the guidelines. I think this case is in no way comparable to Savion Matute. And that's a case where the court buried upward and said this dude earned every day at that time that he's getting whether or not there's a guideline issue or not. I look at this as saying his conduct was so bad, that's where I would have gone whether I'm reversed on the guideline issue or not. We don't have anything anywhere near that here. It's a high bar for the government to meet on intended loss. And there's simply no evidence in the record to suggest that this was not tethered to the guidelines. Thank you, Your Honors. Thank you. Mr. Jurczyk. Thank you, Judge. I want to start by addressing stipulation as the other part to the off-ramps that I mentioned for the government with respect to Mr. Odom. The court asked about stipulation with respect to Fialco. I want to mention that stipulation was available and we concede that. But the government stipulation went beyond just asking to stipulate that the documents were produced. The government also requested stipulation as to admissibility, which means that we couldn't make, for instance, a 403 objection to the documents. This is overreach by the government, over prosecution. I think had the government just asked for a stipulation that the documents had been provided to Odom by his side, I mean, those are all facts that he testified to himself. So the likelihood is that there would have been that stipulation. But to take the objection back out of his hands was, in our opinion, going too far. I also want to hit on a couple of issues with respect to the sufficiency since the government broached it. This circuit has put a pretty high bar on the knowledge that one needs to have in order to knowingly launder money. And the standard is, quote, actual subjective knowledge. And that's another Campbell case that is cited in our briefing. So the court's not looking for imputed knowledge like much of what the government has identified as evidence against Isat. They're looking for actual subjective knowledge. And I don't think it's there. The evidence that the government is citing, for instance, the forwarded emails. I'll just take that because I'm running out of time. Isat demonstrably does not speak English. He needed an interpreter to step in because they didn't understand the English he was attempting to speak at trial. He only knew how to forward emails that was testified to by his daughter and not disputed in the record. So that's my time. Thank you. All right. Thank you. Mr. Kilbourn, you have three minutes. Thank you, ma'am. And to answer your earlier question, I apologize for not having it at the time. United States v. Holmes, 840 F. 2nd, 246 and at 248. It's a case that deals with the context of the judicial function and 1001 in terms of the administrative and judicial functions of the court. And they quote from. And that was also cited in your brief, I think. That was also cited in my brief. Okay. Thank you. And so in that particular case, they cite to Morgan, which is in the D.C. circuit, saying. We are certain that neither Congress nor the Supreme Court intended the statute to include traditional trial tactics within its statutory terms. We argue that that's why 1001 in this particular context is so dangerous. Because you are in the trial process. You are sharing information back and forth so that we can have the government's information. Again, I was in trial counsel. But the defense provides their information. And we believe that 1001 in that context puts their finger on the scale. And the defense can make false statements during the trial process. And they not fall within the parameters of 1001? They can't be prosecuted for a false statement? You asked me whether counsel can make false statements. And I think in this particular case, obviously, you have a document. And remember what happened. A document that counsel was given that was then given to the government. I think counsel was restrained by our ethical rules. I don't believe I can lie to the government. Didn't an appellant make a false statement? To the extent the jury found that the appellant was responsible. I mean, the indictment was against the appellant. It was against the appellant. And the jury found that he was the author of that particular document. And it was the attorney then who gives it to the government. I think that break in 1001 is critical as 1001 is structured. That the attorney was the one who made the decision to give it to the government or not. And we would argue, Your Honor, that when you get 1001 into the trial process. So if the defendant uses his attorney as the middleman for his false statements, then the defendant can't be charged with a false statement as a part of the trial process? Is that what you're saying? Because it sounds like it. I would argue that 1001 has no place in the trial process. Okay, yeah, that's where we were before. That's where we were before. I know you may not agree with me, Your Honor, but I believe it's something that I wish the court would look into because of the effects of what happens. It's the sharing of documents that has a chilling effect on the exchange of documents between the defendant and the government. Because when this case comes out, defense counsel are going to have to go, is this document correct? Am I possibly bringing a criminal charge against my client by sharing this document with the government? That's the trial process, and there are much better regimes to use to truth test than 1001. Thank you, Your Honor. All right, thank you all for your arguments. We'll come down and greet counsel and then proceed to our last case.
judges: Stephanie D. Thacker, A. Marvin Quattlebaum Jr., DeAndrea Gist Benjamin